J-A01044-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.N.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2297 EDA 2017 |

Appeal from the Order Entered June 29, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000137-2017,
CP-51-DP-0000502-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: J.A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2299 EDA 2017 |

Appeal from the Order Entered June 29, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000138-2017,
CP-51-DP-0001592-2014

BEFORE:   LAZARUS, J., OTT, J., and PLATT*, J.

MEMORANDUM BY OTT, J.:                    **FILED FEBRUARY 27, 2018**

J.R. ("Father") appeals from the decrees entered on June 29, 2017, in

the Court of Common Pleas of Philadelphia County, involuntarily terminating

_____
*   Retired Senior Judge assigned to the Superior Court.

his parental rights to his daughter, B.N.R., and his son, J.A.R. (collectively, "Children").[1] Upon careful review, we affirm.[2]

In its Rule 1925(a) opinion, the trial court thoroughly set forth the factual and procedural history of this case, which the documentary evidence supports. As such, we adopt it herein. **See** Trial Court Opinion, 8/30/17, at 2-17.

By way of background, B.N.R. was born in July of 2013, with opiates, cocaine, and methadone in her system. **Id.** at 2. The Philadelphia Department of Human Services ("DHS") placed her in Father's custody upon discharge from the hospital. N.T., 6/29/17, at 17-18. DHS removed B.N.R. from Father's custody in January of 2014, after he told DHS that he was unable to care for her on a full-time basis. Trial Court Opinion, 8/30/17, at 5. The trial court adjudicated B.N.R. dependent on March 7, 2014.

---

[1] By separate decrees entered on June 29, 2017, the trial court involuntarily terminated the parental rights of the Children's mother, C.S. ("Mother"). Mother did not file notices of appeal.

[2] During the subject proceedings, the Children were represented by the Child Advocate, Lindsay Palmer, Esquire, and by the Guardian *ad litem* ("GAL"), Marie Charles-Asar, Esquire. **See In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (holding that 23 Pa.C.S. § 2313(a) requires that trial courts appoint legal counsel for a child in a contested involuntary termination proceeding, and that the failure to do so constitutes structural error, which can never be harmless in nature). In these appeals, the Child Advocate filed an appellee brief in support of the involuntary termination decrees. Although the GAL did not file an appellee brief, she recommended the termination of Father's parental rights in her closing argument to the trial court. N.T., 6/29/17, at 64-65.

J.A.R. was born in July 2014, with methadone and opiates in his system. *Id.* at 6-7. DHS never placed J.A.R. in Father's custody. The trial court adjudicated him dependent on August 15, 2014. The Children were placed in the kinship care of M.R., their maternal grandmother, who, along with their maternal grandfather, is a pre-adoptive resource. *Id.* at 6, 9-10; N.T., 2/7/17, at 16.

Since the Children's adjudications, Father has resided with Mother and/or maintained contact with her. Father and Mother engaged in domestic violence throughout their relationship. N.T., 6/29/17, at 21. Further, Mother has an extensive history of illegal drug use, and she has repeatedly, and unsuccessfully, attended inpatient and outpatient drug and alcohol treatment programs. In addition, Mother has a drug-related criminal conviction from 2012, for which she was sentenced to twelve months of probation. In 2013, 2014, and 2015, Mother was convicted of violating the terms of her probation. She was sentenced to an additional twelve months of probation each time. Trial Court Opinion, 8/30/17, at 5, 8, 11.

Mother's family service plan ("FSP") granted her supervised visitation with the Children. Father's FSP granted him unsupervised visits twice weekly to occur within the maternal grandmother's community. By permanency review orders dated August 19, 2015, Father's visits with the Children were changed to supervised due to his allowing Mother to have contact with the

Children.[3]  Order, 8/19/15; **see also** N.T., 2/7/17, at 28-29.  The orders also referred Father for a parenting capacity evaluation and for services at the Achieving Reunification Center ("ARC").  Order, 8/19/15.

In September of 2015, DHS referred Father for a parenting capacity evaluation ("PCE") at Forensic Mental Health Services, LLC, to assess his ability to provide permanency and safety to the Children.  **See** DHS Exhibit 1. The PCE was performed by Erica G. Williams, Psy.D., and Samantha Peterson, M.A.  By report dated April 22, 2016, Dr. Williams and Ms. Peterson opined that Father did not have the capacity to provide the Children with safety and/or permanency due to his failure to acknowledge his role in the Children's placement and his relationship and contact with Mother.  DHS Exhibit 1, at 10-11.  The PCE resulted in recommendations that Father participate in individual therapy with a focus on the issues necessitating the Children's placement and abstain from contact with Mother, *inter alia*.  **Id.** at 11.  The FSP dated September 8, 2015, required Father to follow the PCE recommendations.[4]

On February 3, 2017, DHS filed petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8),

_____

[3] By the time of the termination hearing, Father's supervised visits occurred weekly, for a total of eight hours per month.  N.T., 2/7/17, at 20.

[4] In addition, the FSP objectives required Father to participate and successfully complete the parenting services at ARC; maintain supervised visits with the Children; locate suitable housing; and maintain employment.  Trial Court Opinion, 8/30/17, at 13.

and (b). The first day of the hearing occurred on February 7, 2017, during which DHS presented the testimony of Volieda Hamm, the Community Umbrella Association ("CUA") case manager. Father testified on his own behalf. Father did not acknowledge his parental incapacity that resulted in the Children's placement. N.T., 2/7/17, at 33-36. Rather, he testified that the Children were in placement due to Mother's drug problem. *Id.* at 33-34. Father admitted that he had not participated in individual therapy as required by the PCE, but that he planned to do so. N.T., 2/7/17, at 30-31. Father testified that he has been renting a house since November of 2016, which is suitable for the Children. N.T., 2/7/17, at 32, 41.

At the completion of the hearing, the trial court ordered, on the record and in open court, a bonding evaluation with respect to Father and the Children. In addition, the court ordered DHS to make three unannounced visits to Father's home and evaluate it for suitability. N.T., 2/7/17, at 42-43.

The second day of the hearing occurred on June 29, 2017, during which DHS presented the testimony of Erica Williams, Psy.D., who conducted the PCE. She testified that Father started individual therapy only one month ago, in May of 2017. N.T., 6/29/17, at 29. Dr. Williams also conducted the court-ordered bonding evaluation. In addition, DHS presented the testimony of Patience Kpodi, DHS caseworker. The Child Advocate presented the testimony of M.R., the Children's maternal grandmother. Father testified again on his own behalf and stated that he is employed at a casino that offers day care services for employees' children. N.T., 6/29/17, at 57. The record does not

provide any evidence with respect to when Father secured employment or his work schedule.

By decrees dated and entered on June 29, 2017, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court filed its Rule 1925(a) opinion on August 30, 2017.

On appeal, Father presents the following issues for our review:

> 1. Did the court err or abuse its discretion when terminating Father's parental rights under § 2511(a) when Father has proven ready to be a parent having fully performed his duties such as required by his plan, met all of his goals under the plan and satisfied the requirements of § [2511](a)(1), (2), (5), and (8) under the totality of the circumstances; and, therefore, terminating Father's parental rights on non[-]competent or insufficient evidence?
>
> 2. Did the court err or abuse its discretion when terminating Father's parental rights under § 2511(b) with incomplete analyses of the emotional needs of the Children, and therefore, terminating Father's parental rights on non[-]competent or insufficient evidence?

Father's brief at 2.

We review Father's issues according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

- 6 -

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we conclude that the certified record supports the decrees pursuant to Section 2511(a)(2) and (b), which provides as follows.[5]

_____

[5] Based on this disposition, to the extent Father argues that the trial court abused its discretion in terminating his parental rights pursuant to Section

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued

---

2511(a)(1), (5), and (8), we need not review those sections. Nevertheless, we observe that termination pursuant to Section 2511(a)(5) and (8) was not proper with respect to J.A.R. because he was not removed from Father's care. *See In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation

omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Father contends that the evidence is insufficient to support termination pursuant to Section 2511(a)(2) because he complied with his FSP objectives to maintain supervised visits with the Children, and he has secured housing and employment. With respect to his failure to timely follow the PCE recommendations, Father contends, in effect, that it is of no consequence to his ability to keep the Children safe. *See* Father's brief at 17. Specifically, he asserts that he can request a "stay away" order to keep Mother away from the Children. Father further asserts that the testimony of Dr. Williams and the CUA case manager, Ms. Hamm, was not credible. Father's arguments are without merit.

At the conclusion of the evidentiary record on June 29, 2017, the trial court set forth its rationale for terminating Father's parental rights pursuant to Section 2511(a) as follows, in relevant part.

> Throughout the history of the case, the clear goals and objectives were laid out for [F]ather. There were many resources made available to [F]ather to assist him with completing these goals, and only lately did [F]ather come to the realization that these goals had to be accomplished. . . .
>
> . . . So, the late efforts of [F]ather are part of the evidentiary record, but they're given very little weight by the [c]ourt because

- 10 -

of the lateness in the untimeliness of these efforts, and what I
believe to be disingenuous effort by the [F]ather to avoid the
termination of his parental rights when for the life of this case, he
had an opportunity to do exactly what he purports to have done
on or about May of this year.

But the record prior to May is clear that [F]ather did not
remedy the issues that brought [C]hildren into care. He made no
realistic effort to remedy those issues.

The idea that he would be able to keep these [C]hildren safe
I think is not borne out by the record because the history shows
that [F]ather repeatedly exposed these [C]hildren to the [M]other,
and there's no doubt in the [c]ourt's mind that if we were to
somehow return these [C]hildren to his care based upon the
historical record these [C]hildren would again be exposed to
[M]other. And that would be a very valid and important safety
concern for these [C]hildren going forward.

. . .

Doctor Williams['] testimony [I] gave great weight[.] I
believe she had great insight into [F]ather, great insight with
respect to whether or not [F]ather had the capacity to appreciate
the factors that placed the [C]hildren in jeopardy[,] to appreciate
what he needed to do to put himself in a position to parent for
these [C]hildren.

. . . The failure [of Father] to remedy the issues and the
length of time of placement for the [C]hildren, the evidence is
clear that [F]ather has not remedied nor will he likely remedy
these issues going forward. . . .

N.T., 6/29/17, at 68-70. We discern no abuse of discretion.

Dr. Williams testified that during her interview with Father he "projected
all of the blame onto the other adults" with respect to the Children's
placement. N.T., 6/29/17, at 18-19. She explained, "It's significant in a
parenting capacity evaluation to understand the reasons that your children
are placed at risk and why they were removed. If you don't see yourself as

- 11 -

having a role [in the child's removal], [then] you're not able to see yourself in a role [of] keeping them safe or making any changes if they are to be returned to your care." *Id.* at 19. In addition, Dr. Williams testified that it was clear from her interview with Father and the reports provided to her by DHS that he was allowing Mother contact with the Children. *Id.* at 19-21. Father defended his conduct by stating that Mother would show up uninvited, and that he was not able to control Mother's actions in this regard. *Id.* at 20. However, Ms. Hamm, the CUA case manager, testified she learned that Father lived with Mother as recently as January of 2017, shortly before the first day of the termination hearing, when Mother left her a voicemail that she and Father were being evicted. N.T., 2/7/17, at 18-19.

In addition, Dr. Williams testified that Father began individual therapy as recommended by the PCE only in May of 2017. N.T., 6/29/17, at 29. However, she testified that the records from Father's therapist indicate, "they're not addressing the concerns [set forth in the PCE]." *Id.*

Based on the foregoing testimonial and documentary evidence, we discern no abuse of discretion by the trial court in concluding that Father's untimely efforts to comply with the PCE and his FSP's are disingenuous. Indeed, Father failed to make diligent efforts towards the reasonably prompt assumption of his full parental responsibilities. *See In re A.L.D.* 797 A.2d at 340. In fact, Father fails to acknowledge his parental incapacity and/or refusal to provide proper parental care in the Children's initial placement in January

of 2014, and in July of 2014, respectively. Further, he fails to take personal responsibility for the Children's continuing placement. In his brief, Father even asserts that he "believes he has the right and should try to reform Mother, using his own efforts, by trying to work with her and her side of the family until it is proved [sic] not working." Father's brief at 23. To the best that we can discern, Father justifies his continuing contact with Mother during the Children's dependencies as his "approach of accommodating all parties, including DHS, and getting everyone involved in the cure of Mother. . . ." *Id.*

As such, we discern no abuse of discretion by the court in finding that Father's repeated and continued incapacity or refusal have caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being, and that the causes of Father's incapacity or refusal cannot or will not be remedied.

With respect to Section 2511(b), Father contends that the Child Advocate did not advocate for the Children's legal interests but for their best interests.[6] Father contends, in fact, that the Child Advocate failed to ascertain

---

[6] In **In re Adoption of L.B.M.**, **supra**, our Supreme Court explained that a child's legal interests are distinct from his or her best interests, in that a child's legal interests are synonymous with the child's preferred outcome, while a child's best interests must be determined by the court. A plurality of the Court held that the appointment of a guardian *ad litem* who is a licensed attorney does not satisfy the statutory mandate in 23 Pa.C.S. § 2313(a) for legal counsel. Four justices disagreed and opined in concurring and dissenting opinions that separate representation would be required only if a child's best interests conflicted with his or her legal interests.

- 13 -

the Children's legal interests.  Father refers us to the Child Advocate's direct examination of the maternal grandmother, as follows.

Q. Did you have a chance to witness a conversation between myself and the [C]hildren about this case?

A. Yes.

Q. And did they say that they're happy living with you?

A. Yes.

Q. And did they say whether they would like to continue living with you?

A. Yes.

N.T., 6/29/17, at 48.  On cross-examination by Father's counsel, the maternal grandmother testified:

Q. But the [C]hildren were never asked [by the Child Advocate] if they were going to live with dad, correct?

A. I don't think so.

*Id.*  at 50.  Father argues that the trial court "should have recessed [the hearing] right then so as to afford the [Child Advocate] another opportunity to ascertain the Children's wish regarding their legal interests."  Father's brief at 25.

Upon review, we conclude Father's argument is without merit.  The Children were three and four years old at the time of the subject proceedings, and they lacked the capacity to articulate their preferences regarding the involuntary termination of Father's parental rights.  To the extent the Child

Advocate argued both the legal and best interests of the Children, we do not find a conflict.

In addition, Father argues that the court abused its discretion in relying on the bonding assessment conducted by Dr. Williams. Specifically, he contends that Dr. Williams' conclusions are general in nature and not based on observing the relationship between Father and the Children.

In analyzing the decrees pursuant to Section 2511(b), we are mindful of the following settled case law.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **In re T.S.M.**, **supra** at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id.** at 269. The **T.S.M.** Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

In this case, Dr. Williams performed the bonding evaluation in June of 2017, which included her personal observation of Father and the Children. N.T., 6/29/17, at 31. Dr. Williams testified that her observations were consistent with the documentation provided to her regarding supervised visits, that he and the Children have "a healthy comfortable relationship during those visits. The children are happy to see him. He is verbally and physically affectionate; the children seek that affection; they return that affection. And throughout the visit he's able to manage his time between the two as well as redirect them and keep them on task and engage with them." **Id.** at 32. Nevertheless, Dr. Williams opined that a parent-child bond does not exist between them. **Id.** She explained that Father does not serve in a parental role for the Children. **Id.** Specifically, Dr. Williams testified:

[Father] does not meet their daily needs. He does not have continuous contact or understanding with them. [H]e is not their identified caregiver, or attachment figure.

Rather, this is an individual that they know to be their father that they get to visit with every week. And at that visit they have snacks, they watch movies, they play games and there's no care provided to the children outside of that supervised setting.

*Id.* at 32-33. Moreover, Dr. Williams testified that the Children will not suffer irreparable harm if Father's parental rights are terminated "based on the lack of a caregiver parent relationship." *Id.* at 33. She continued as follows.

It is noted in the [bonding evaluation] that [the Children] will experience a loss, they'll understand that the visit no longer happens, but much like with a family friend or a cousin or somebody that is briefly in their life for a finite period of time without a definitive role[.] [C]hildren[,] [generally speaking,] are very resilient, if they have a healthy attachment, if they have a permanent place, if they feel secure where they are and they very easily can move past that.

So it's important to allow them to grieve if they experience grief but no way will they suffer irreparable harm by having that sadness or that grief.

*Id.* at 33-34.

It is important to note that the Children's maternal grandmother, who is a pre-adoptive resource, has been B.N.R.'s caregiver since she was five and a half months old, and J.A.R.'s caregiver since he was three months old. *Id.* at 50. Based on the testimonial evidence, we discern no abuse of discretion by the trial court in concluding that the Children would not suffer irreparable harm by the termination of Father's parental rights "and whatever harm might exist would be remedied through the love and care and continued devotion to

- 17 -

these children by the grandmother and the grandfather." *Id.* at 71. The record supports the court's decision pursuant to Section 2511(b) in that terminating Father's parental rights will serve the Children's developmental, physical, and emotional needs and welfare. Accordingly, we affirm the decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/27/18